**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

|  |  |
|---|---|
| JAMI LYNN SCOTT, SHANNON SULANDER, JANNA STEWART, BRETT FREEMAN, RACHEL ROYER, JOEY LEWIS, KORRI CULBERTSON and BRUCE McCONNELL, <br><br> *Plaintiffs,* <br><br> *-vs-* <br><br> SYNEOS HEALTH, LLC, <br><br> *Defendant.* | Case No. _____ <br><br> **JURY DEMAND** |

# C O M P L A I N T

COME NOW THE PLAINTIFFS, JAMI LYNN SCOTT, SHANNON SULANDER, JANNA STEWART, BRETT FREEMAN, RACHEL ROYER, JOEY LEWIS, KORRI CULBERTSON, and BRUCE McCONNELL, sues the Defendant, SYNEOS HEALTH, LLC and would state as follows:

## I. INTRODUCTION

1. The COVID-19 pandemic has impacted every aspect of American life. Governments throughout the world have grappled with how to balance protection of one's health and yet maintain a semblance of normalcy in everyday life.

2. For the first time in the history of the United States, many employers have made a condition of their employees' continued employment that they inject into their bodies multiple times a foreign, experimental drug that lacks approval by the Federal Drug Administration.

3.     Jami Lynn Scott, Shannon Sulander, Janna Stewart, Brett Freeman, Rach sel Royer, Joey Lewis, Korri Culbertson, and Bruce McConnell, are all former employees of Syneos Health, LLC.  They each bring this action for compensatory and statutory damages against Syneos Health, LLC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e for constitutional violations arising out of Syneos' mandate on September 2, 2021, that all employees receive the COVID-19 vaccine.  The Plaintiffs were given no options but to submit to this experimental vaccination or be terminated from their employment.

4.     This mandate inserts the employer into the Plaintiffs' personal and private medical decisions, and violated their sincerely held religious beliefs.

## II. JURISDICTION AND VENUE

5.     This Court has jurisdiction over all federal claims in the Complaint arising under 28 U.S.C. § 1331.  In addition, this Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6.     Venue lies in this District pursuant to 28 U.S.C. § 1391, since this is where the Defendant Syneos Health, LLC is located, and where the discriminatory actions complained of took place.

## III. PARTIES
### *Plaintiffs*

7.     Plaintiff, Jami Lynn Scott is an adult citizen and resident of the State of Texas, and is a former employee of Syneos Health, LLC.

8.     Plaintiff Shannon Sulander is an adult citizen and resident of the State of Oklahoma, and is a former employee of Syneos Health, LLC.

9.     Plaintiff, Janna Stewart is an adult citizen and resident of Madison County, Illinois, and is a former employee of Syneos Health, LLC.

10. Plaintiff, Brett Freeman is an adult citizen and resident of the State of Oklahoma, and is a former employee of Syneos Health, LLC.

11. Plaintiff, Rachel Royer is an adult citizen and resident of the State of Minnesota, and is a former employee of Syneos Health, LLC.

12. Plaintiff, Joey Lewis is an adult citizen and resident of the State of Washington, and is a former employee of Syneos Health, LLC.

13. Plaintiff, Korri Culbertson is an adult citizen and resident of the State of California, and is a former employee of Syneos Health, LLC.

14. Plaintiff, Bruce McConnell is an adult citizen and resident of the State of Colorado, and is a former employee of Syneos Health, LLC.

### *Defendant*

15. Defendant Syneos Health, LLC ("Syneos") is a Delaware Limited Liability Company. Its principal headquarters are located at 1030 Sync Street, Morrisville, North Carolina. Process may be served on its registered agent in the State of North Carolina: United Agent Group, Inc., 15720 Brixham Hill Avenue, # 300, Charlotte, NC 28277.

### IV. STATEMENT OF FACTS

16. Syneos is a biopharmaceutical company with employees located in various states including the State of North Carolina.

17. Syneos' clients include: Johnson & Johnson, Abbvi/Pharmacyclics, Nevro, and LEO Pharma.

18. On March 24, 2021, Syneos updated their Return To Field (RFT) guidance policy. The new policy explained that on April 19, 2021, employees could resume making in-person calls to clinics. There were no restrictions stated with regard to this guidance policy.

3

19.     On May 11, 2021, Syneos announced that they would *not* be requiring employees to submit to COVID-19 vaccination. However, Syneos continued to "encourage [its employees] to get vaccinated if [they] have not already done so.

20.     The U.S. Food and Drug Administration ("FDA") announced on July 12, 2021, that near real-time surveillance detected four potential Adverse Events of Interest (AEI) following receipt of Pfizer's vaccine.[1] The four potential AEI were pulmonary embolism, acute myocardial infarction, immune thrombocytopenia, and disseminated intravascular coagulation, which means that the events were blood clotting in the lungs, insufficient oxygen to the heart, low blood platelet levels, and disseminated intravascular coagulation.[2]

21.     The FDA fact sheets specified, by July of 2021, that individuals set to receive the Pfizer, Moderna, Johnson & Johnson, and Novavax vaccines could experience a severe allergic reaction. Myocarditis and pericarditis, two forms of heart inflammation, are possible after receipt of the Pfizer, Moderna, and Novavax. Trials of these vaccines by July of 2021, demonstrated a causal link between heart inflammation and the Pfizer and Moderna vaccines, according to U.S. health officials. Other side effects that had been reported after receipt of one or more of the vaccines included swollen lymph nodes, skin tingling, blood clots, and diarrhea[3].

---

[1] U.S. Food and Drug Administration, Initial Results of Near Real-Time Safety Monitoring of COVID-19 Vaccines in Persons Aged 65 Years and Older, July 12, 2021, https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/initial-results-near-real-time-safety-monitoring-covid-19-vaccines-persons-aged-65-years-and-older
[2] *The Epoch Times*, Exclusive: FDA Preparing to Publish Study on 4 Potential Adverse Events Following Pfizer Vaccination, Zachary Stieber, October 2, 2022, https://www.theepochtimes.com/exclusive-fda-preparing-to-publish-study-on-4-potential-adverse-events-following-pfizer-vaccination_4768103.html?utm_source=ref_share&utm_campaign=mb-cc
[3] *The Epoch Times*, Exclusive: FDA Preparing to Publish Study on 4 Potential Adverse Events Following Pfizer Vaccination, Zachary Stieber, October 2, 2022, https://www.theepochtimes.com/exclusive-fda-preparing-to-publish-study-on-4-potential-adverse-events-following-pfizer-vaccination_4768103.html?utm_source=ref_share&utm_campaign=mb-cc

22.     Despite the FDA admission that there could be possible severe reactions from these COVID-19 vaccines, on September 2, 2021, all Syneos U.S. – based employees were notified of a companywide vaccine mandate by email, with medical and religious exemptions indicated as offered options. The notice provided a deadline of October 22, 2021 to either receive the full vaccination protocol (either two Pfizer, or two Moderna, or one Johnson & Johnson) and upload extensive proof or file an exemption request.

23.     Several days later on September 9, 2021, President Biden announced a "new plan to require more Americans to be vaccinated" by imposing "new vaccination requirements" that would "require all employers with 100 or more employees, to ensure their workforces are fully vaccinated or show a negative test at least once a week." He also announced plans to "require vaccinations" of all "those who work in hospitals, home healthcare facilities, or other medical facilities." The so-called "Biden Mandate" further provided an executive order requiring all executive branch federal employees to be vaccinated. Another executive order required that all federal contractors to do the same.[4]

24.     Following President Biden's remarks, the Department of Labor's Occupational Safety and Health Administration (OSHA issued an Emergency Temporary Standard (ETS) to implement" the requirement that all employers with 100 or more employees to ensure their workforce is fully vaccinated or require any workers who remain unvaccinated to produce a negative test result on at least a weekly basis.

25.     On October 6, 2021, Syneos promulgated a letter which provided that a "determination within 15 business days" would be made as to whether Syneos would "provide an

_____

[4] Joseph Biden, Remarks at the White House (September 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (accessed September 10, 2021).

accommodation without creating an undue hardship on the company." Syneos did not communicate a "determination within 15 days" that an accommodation request for an exemption would impose an "undue hardship on the Company." Instead, the employees continued to perform all of the employment related responsibilities and engage in any in-person interactions with customers as an assigned employee of their respective clients. It was not until some 65 days later that Syneos informed the employees by letter dated December 9, 2021 that the approved accommodations could not be granted due to "undue hardship" to Syneos because of the "extensive in-person contact" job responsibilities. The superficial and conclusory communication provided no specificity as to how an exemption for the employees would impose an undue hardship to Syneos, nor did it explain why the employees of those clients who had the exact same "extensive in-0person contact" with employees were receiving exemptions and accommodations. Nor did the letter or any subsequent communication explain why those employees (see Plaintiff, Korri Culbertson's biographical narrative below, paragr. 179, *et. seq.*) that performed the majority of their work virtually and not "in-person" could not be granted exemption and/or accommodation.

26. On October 20, 2021, Syneos' General Counsel and Corporate Secretary, Jonathan Olefson, sent an email to all of the company's U.S.-based corporate, commercial and clinical employees advising them of a deadline of October 22, 201, within which to upload to the company's website their personal COVID-19 vaccination information proving receipt of the experimental COVID-19 vaccine.

27. Syneos' company-wide vaccine order made no exception for individuals who had natural immunity, which is proven 27-times more effective than vaccinated immunity in preventing symptomatic COVID.[5]

---

[5] Dr. Marty Makary, "Dr. Marty Makary: I have medical concerns around Biden's new vaccine mandates," Fox News, (September 10, 2021), https://www.foxnews.com/opinion/medical-concerns-biden-new-vaccine-mandates-dr-marty-

28.     Starting November 1, 2021, Syneos also implemented a companywide testing policy for the self-care and oral team contracts, and for those individuals who did not submit to vaccination. Employees were instructed to go to Walgreen first thing in the morning, every day, prior to going out into the field or working, to get Covid-19 testing done.

29.     The following week, Syneos changed its mandated testing policy and allowed employees to purchase at home tests. It later also provided employees with home test kits.

30.     On November 4, 2021, the Los Angeles Times Published an article entitled, "Study Shows Dramatic Decline In Effectiveness of All Three COVID-19 Vaccines Over Time." The article discussed a study of nearly 800,000 U.S. veterans between early March of 2021 and September 2021, which found that Moderna's two-dose COVID-19 vaccine, measured as 89% effective in March, was only 58% effective by September. The effectiveness of the vaccines made by Pfizer and BioNTech, which also requires two doses, fell from 87% effective to 45% in the same period. And lastly, the Johnson & Johnson's single-dose vaccine plunged from 86% effective to just 13% within six months. [6]

31.     In the wake of  several red flag reports within scientific communities concerning the risks associated with Covid-19 vaccines, various states began adopting new anti-discrimination laws regarding the Covid vaccine.

32.     On December 9, 2021, Syneos sent a letter to employees with approved exemptions stating that those with exemptions were granted only a "**temporary accommodation**" through

---

makary ; Comparing SARS-CoV-2 nautral immunity to vaccine-induced immunity: reinfections versus breakthrough infections, August 25, 2021, Sivan Gazit, MD MA, Roei Shlezinger, BA, Galit Perez, MN MA, Roni Lotan, PhD, Asaf Peretz, MD, Amir Ben-Tov, MD, Dani Cohen, PhD, Khitam Muhsen, PhD, Gabriel Chodick, PhD MHA and Tal Patalon, MD, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.article-info

[6] Melissa Healy, "Study shows dramatic decline in effectiveness of all three COVID-19 vaccines over time, Los Angeles Times, (November 4, 2021), https://www.latimes.com/science/story/2021-11-04/study-shows-dramatic-decline-in-effectiveness-of-covid-19-vaccines

January 31, 2022, because unvaccinated employees would cause an "undue burden" on the company by remaining unvaccinated. The letter gave employees a choice to either provide proof of vaccination or be terminated. While the letter also offered to allow employees to relocate to another position within the organization which fit their qualifications and need for accommodation, such positions were essentially nonexistent.

33.     Oddly Syneos exempted all Florida resident employees from this December 9, 2021, announcement.   Employees who resided in Florida were not terminated for lack of vaccination.

34.     All other employees had until January 14, 2022, within which to obtain their first COVID-19 vaccination and upload their vaccination card.  Each of the Plaintiffs timely objected to the vaccine for religious grounds, which included and do include: because the four most widely used COVID-19 vaccines across the globe all used abortion-derived fetal cell lines in their research, development, production and/or testing. Those vaccines are: AstraZeneca/Oxford, Janssen/Johnson & Johnson, Moderna, Pfizer/BioNTech. AstraZeneca/Oxford and Janssen/Johnson & Johnson used abortion-derived fetal cell lines in all phases of their vaccine production; in the research, development, production, and testing. Moderna and Pfizer/BioNTech used abortion-derived fetal cell lines in the testing of their COVID-19 vaccines [7].  Plaintiffs sincerely believe that the ingestion of other strains of human DNA and human tissue – *and those strains of cells which are derived by fetal cell lines* – are profoundly contrary to their religious teachings and beliefs.  Three different abortion-derived fetal cell lines were used in the four COVID-19 vaccines: HEK-293, PER.C6, and MRC-5. AstraZeneca/Oxford used two fetal cell lines in the making of its vaccine: HEK-293and MRC-5. Janssen/Johnson & Johnson used

---

[7] Admin, "2021 Update: COVID-19 Vaccines Using Aborted Fetal Cell Lines," A Voice For Truth, (November 14, 2021), https://avoicefortruth.com/2021-update-covid-19-vaccines-using-aborted-fetal-cell-lines/

PER.C6. Moderna used HEK-293. And Pfizer/BioNTech used HEK-293T/17 (a derivative of HEK-293T, which is a derivative of HEK-293. [8] HEK-293 human fetal cell line (HEK = Human Embryonic Kidney) was derived from a baby aborted in the Netherlands in the early 1970s. The kidney tissue cultures were collected by Dr. Alex VanderEb in 1972, and then used to develop the HEK-293 fetal cell line by Dr. Frank Graham in 1973. The "293" in the HEK-293 refers to the number of fetal samples used in the research. PER.C6 human fetal cell line was developed in 1985/1995 from the retinal tissue of an aborted baby at 18 weeks' gestation. The retinal cultures were taken by Dr. Alex VanderEb in 1985, but it wasn't until 1995 that the PER.C6 cell line using those cultures was developed by Dr. Ron Bout and Dr. Frits Fallaux. MRC-5 human fetal cell line was developed in 1966 by researchers at Medical Research Council in the UK. This cell line came from a 3 ½ month gestation baby boy who was aborted for psychiatric reasons from a physically healthy 27 year old mother. The research and development to make a successful fetal cell line historically takes many abortions, not just the one that is ultimately used for the final product. [9]

35.     Alternatively and cumulatively, plaintiffs objected and/or do object on the grounds that the vaccines have been proven conclusively in several studies to cause alteration of human DNA through the integration of SARS-DoV-2 RNA into human DNA by endogenous reverse transcriptase activity, and that RNA sequences can be transcribed into DNA and may be actively integrated into the genome of affected human cells.  (*see, "Potential Mechanisms for Human Genome Integration of Genetic Code from SARS . . . mRNA Vaccination,"  Authors:*

---

[8] Admin, "2021 Update: COVID-19 Vaccines Using Aborted Fetal Cell Lines," A Voice For Truth, (November 14, 2021), https://avoicefortruth.com/2021-update-covid-19-vaccines-using-aborted-fetal-cell-lines/

[9] Admin, "2021 Update: COVID-19 Vaccines Using Aborted Fetal Cell Lines," A Voice For Truth, (November 14, 2021), https://avoicefortruth.com/2021-update-covid-19-vaccines-using-aborted-fetal-cell-lines/

*Kyriakopoulos, McCullough, Nigh, Seneff, Sept 1, 2022*).  Plaintiffs object to the vaccines in accordance with the sincerely held religious belief of each claimant, that human DNA – the key to the composition of the whole of the human body – is created by God, and as such claimants sincerely believe that their religions prohibit them from knowingly ingesting substances which may directly alter the key to the composition of the human body.  It is further sincerely believed by all claimants that it is prohibitive by their religions that substances which have a substantial or unreasonable likelihood or risk of causing a change to human DNA may be knowingly ingested by him/her.

36.     Alternatively and cumulatively, plaintiffs objected and/or do object on the grounds that, as noted above in this Complaint and as has been widely established by established scientific communities in all Western societies participating in the vaccine trials and administration, the vaccines have been proven to produce myriad adverse, dangerous and even lethal physical effects. Each claimant holds sincere religious belief that ingesting (particularly via intravenous injection into the bloodstream) substances known to have a substantial likelihood of such effects is contrary to and prohibited by his/her religion

37.     On November 16, 2021, the Occupational Safety and Health Administration (OSHA) announced that it was suspending all implementation and enforcement efforts related to the Emergency Temporary Standard (ETS) on mandatory COVID-19 vaccination and testing in the workplace. [10]

38.     Likewise, on November 12, 2021, the Fifth Circuit Court of Appeals recognized in a challenge to the Biden mandate that a naturally immune unvaccinated worker is presumably at

---

[10] United States Department of Labor, OSHA, Emergency Temporary Standard, COVID-19 Vaccination and Testing ETS, (November 12, 2021),  https://www.osha.gov/coronavirus/ets2

less risk than an unvaccinated worker who has never had the virus. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, No. 21-60845, 2021 WL 5279381, at *6 (5th Cir. Nov. 12, 2021).

39.     On January 2, 2022, while the Plaintiffs were still protected by the "temporary accommodation",  United States District Judge Mark T. Pittman ordered that the Food and Drug Administration release thousands of pages of documents it relied on to license the COVID-19 vaccine. The order stemmed from a Freedom of Information Act document lawsuit by a coalition of doctors and scientists with the nonprofit Public Health and Medical Professionals for Transparency.[11]

40.     Judge Pittman ordered the FDA to turn over 55,000 pages of documents a month. More than 12,000 pages were released by January 31, 2022;  All of the Pfizer vaccine data became available public for the first time on or about September 30, 2022.

### Documented Medical Risks Associated With The Vaccine and Its Receding Benefits

41.     In a 38-page document tiled 5.3.6 CUMMULATIVE ANALYSIS OF POST-AUTHORIZATION ADVERSE EVENT REPORTS OF PF-07302048 (BNT162B2) RECEIVED THROUGH 28-FEB-2021[12], *Pfizer admitted that when it applied for FDA approval, it was aware of almost 158,000 adverse events*. This document also features an appendix with a list which reports that Pfizer's COVID vaccine has a range of 1,291 possible side effects.

42.     The list of side effects from the Pfizer vaccine include: acute kidney injury, acute flaccid myelitis, anti-sperm antibody positive, brain stem embolism, brain stem thrombosis,

---

[11] See *Public Health and Medical Professionals for Transparency v. Food and Drug Administration,* No. 4:21-CV-01058-P, (N.D. Tex. Jan. 6, 2022).
[12] 5.3.6 CUMMULATIVE ANALYSIS OF POST-AUTHORIZATION ADVERSE EVENT REPORTS OF PF-07302048 (BNT162B2) RECEIVED THROUGH 28-FEB-2021, https://www.riotimesonline.com/wp-content/uploads/2022/03/Pfizer-real-data-released.pdf

cardiac arrest, cardiac failure, cardiac ventricular thrombosis, cardiogenic shock, central nervous system vasculitis, death neonatal, deep vein thrombosis, encephalitis brain stem, encephalitis hemorrhagic, frontal lobe epilepsy, foaming at mouth, epileptic psychosis, facial paralysis, fetal distress syndrome, gastrointestinal amyloidosis, generalized tonic-clonic seizure, Hashimoto's encephalopathy, hepatic vascular thrombosis, herpes zoster reactivation, immune-mediated hepatitis, interstitial lung disease, jugular vein embolism, juvenile myoclonic epilepsy, livery injury, low birth weight, multisystem inflammatory syndrome in children, myocarditis, neonatal seizure, pancreatitis, pneumonia, stillbirth, tachycardia, temporal lobe epilepsy, testicular autoimmunity, thrombotic cerebral infarction, Type 1 diabetes mellitus, venous thrombosis neonatal, vertebral artery thrombosis among 1,246 other medical conditions following vaccination.

43.     This document demonstrates that people aged 31-50 fare the worst after getting injected with the Pfizer vaccine. And women appear to suffer far more damage from the vaccine compared to men, according to the data, as do both men and women between the ages of 31 and 50. People in the 51-64 years old demographic are next in line, followed by the elderly and younger people between the ages of 18-30.

44.     On September 22, 2022, a secondary analysis of the data from the original clinical trials for the Pfizer and Moderna COVID-19 vaccines was published.  This second look of the original 2020-2021 data revealed that Pfizer trial participants who received the vaccine were 36% more at risk of a serious adverse event, while Moderna trial participants who received a vaccine were 6% more at risk.[13] These severe adverse events were defined as events that resulted in serious conditions such as death, inpatient hospitalization, and persistent disability. In total, vaccinated

---

[13] Elsevier, Vaccine, Volume 40, Issue 40, 22 September 2022, pages 5798-5805, Serious adverse events of special interest following mRNA COVID-19 vaccination in randomized trials in adults, Joseph Fraiman, Juan Erviti, Mark Jones, Sander Greenland, Patrick Whelan, Robert M. Kaplan, Peter Doshi; https://www.sciencedirect.com/science/article/pii/S0264410X22010283#b0005

trial volunteers suffered from 333 serious adverse events per 10,000 participants, including 139 special interest. [14]

45.     Another scientific research paper, published on September 26, 2022, in the Journal of Insulin Resistance, noted that re-analysis of randomized controlled trials using the messenger ribonucleic acid (mRNA) technology suggests a greater risk of serious adverse events from the vaccines than being hospitalized from COVID-19.[15] The article's conclusion was that "it cannot be said that the consent to receive these agents was fully informed, as is required ethically and legally. A pause and reappraisal of global vaccination policies for COVID-19 is long overdue."[16]

46.     Dr. Malhotra explained in the article that results from "the original 2020 trials of the COVID-19 vaccine, suggested that the vaccine was only preventing a person from having a symptomatic positive test, and the absolute risk reduction for this was 0.84% (0.88% reduced to 0.04%). In other words, if 10,000 people had been vaccinated and 10,000 had not, for every 10,000 people vaccinated in trial 4 would have tested positive with symptoms compared to 88 who were unvaccinated. Even in the unvaccinated group, 9,912 of the 10,000 (over 99%) would not have tested positive during the trial period. Another way of expressing this is that you would need to vaccinate 119 people to prevent one such symptomatic positive test (assumed to be indicative of an infection, which in itself, is potentially misleading buy beyond the scope of this article)."[17]

47.     Dr. Malhotra further explained that "what the [2020] trial did not show was any statically significant reduction in serious illness of COVID-19 mortality from the vaccine over the 6-month period of the trial, but the actual numbers of deaths (attributed to COVID-19) are still

[14] *The Epoch Times*, Vaccinated at Higher Risk of Serious Adverse Events: Reanalysis of Original Trial Data, Zachary Steiber, September 2, 2022, https://www.theepochtimes.com/vaccinated-at-higher-risk-of-serious-adverse-events-reanalysis-of-original-trial-data_4707356.html?utm_source=ref_share&utm_campaign=mb-cc

[15] Malhotra A. Curing the Pandemic of Misinformation on COVID-19 mRNA Vaccines Through Real Evidence-Based Medicine, Part 1, J. Insul. Resist. 2022; 5(1), a71. https://doi.org/10.4102/jir.v5i1.71

[16] *Id.* p.1

[17] *Id.* p. 3

important to note. There were only two deaths from COVID-19 in the placebo group and one death from COVID-19 in the vaccine group. Looking at all-cause mortality over the longer period, there were actually slightly more deaths in the vaccine group (19 deaths) than in the placebo group (17 deaths). Also of note was the extremely low rate of COVID-19 illness classed as severe in the placebo group (nine severe cases out of 21,686 subjects, 0.04%), reflecting a very low risk of severe illness even in regions chosen for the trial because of perceived high prevalence of infection."[18]

48.     In the spring of 2021, prevalence of myocarditis skyrocketed, when the vaccines were rolled out to the younger population. [19]

49.     Dr. Malhotra, noted that "a number or reports have produced concerning rates of myocarditis, depending on age, ranging from 1 in 6,000 in Israel to 1 in 2,700 in a Hong Kong study in male children and adolescents aged 12-17 years."[20]

50.     In a Pfizer animal study published on July 22, 2021, Pfizer admits that the mRNA vaccines distribute from the injection site to other organs, and can cause lethal damage. [21]

51.     This 2021 study by Pfizer by Michael Palmer, MD and Sucharit Bhakdi, MD, provides irrefutably proof of causality of vascular and organ damage induced by mRNA vaccines. Drs. Palmer and Bhakdi, discerned that the Pfizer study noted, "that the labelled vaccine shows up in the blood plasma after a very short time – within only a quarter of an hour. The plasma level peaks two hours after the injection. As it drops off, the model vaccine accumulates in several other organs. The fastest and highest rise is observed in the liver and the spleen. Very high uptake is also

---

[18] *Id*. p. 3
[19] *Id*. p. 5
[20] *Id*. p. 5
[21] SARS-CoV-2 mRNA Vaccine (BNT162, PF-07302048) 2.6.4 Summary Statement of the pharmacokinetic study, p. 10, July 22, 2021, Pfizer, Michael Palmer, https://archive.org/details/pfizer-confidential-translated/mode/2up

observed with the ovaries and the adrenal glands. Other organs (including the testes) take up significantly lower levels of the model vaccine. We note, however, that at least the blood vessels will be exposed and affected in every organ and in every tissue."[22]

52.     Dr. Joseph Mercola, recently wrote: "Pfizer, the U.S. Food and Drug Administration and the Centers for Disease Control and Prevention have all repeatedly lied about the safety and effectiveness of the shots, as Pfizer's own trial data show they're about as dangerous as they come." More Studies Confirm the COVID Jab Does More Harm Than Good, Dr. Joseph Mercola, *Epoch Times*, October 4, 2022.[23]

53.     From December 17, 2020, the date of the initiation of the global rollout and administration of the COVID-19 vaccines through August 6, 2021, approximately 50% of the population of the United States had received two doses of the COVID-19 products with 427,831 adverse events (AE) reported to the Vaccine Adverse Events Reports System (VAERS). [24]

54.     Of these 427,831 adverse events, the VAERS data demonstrated the following statistics for Severe Adverse Events (SAE), 6,639 deaths, 26,402 hospitalizations, 59,061 ER visits, 7,423 life-threatening events, 6,861 disabled and 258 birth defects reported. Furthermore, female reproductive issues (FRIs) and AE's in children aged 12-18 years are on the rise. By August 6, 2021, there were 6,398 total FRIs and 18,021 AEs reported in young children aged 12 through 18. Those children represented 4.2% of the total VAERS data and 12.9% of all cardiovascular

---

[22] Vascular and Organ Damage induced by mRNA vaccines: irrefutable proof of causality, Michael Palmer, MD and Sucharit Bhakdi, MD, August 18, 2022, https://doctors4covidethics.org/wp-content/uploads/2022/08/causality-article.pdf

[23] https://www.theepochtimes.com/more-studies-confirm-the-covid-jab-does-more-harm-than-good_4774529.html?utm_source=ref_share&src_src=ref_share&utm_campaign=he-cc&src_cmp=he-cc

[24] Critical Appraisal of VAERS Pharmacovigilance: Is the U.S. Vaccine Adverse Events Reporting System (VAERS) a Functioning Pharmacovigilance System? Jessica Rose, PhD, MSc, BSc, The Institute for Pure and Applied Knowledge, Volume 3:100-129, p. 105, October, 2021, https://61ee839e4c3e409708bac62c--i-do-not-consent.netlify.app/media/Pharmacovigilance%20VAERS%20paper%20FINAL_OCT_1_2021.pdf

AEs.[25]  Further, there is nearly unanimous consensus among statistical experts that VAERS reports of adverse events likely reflect only between 10% and 30% of all actual adverse events.

55.    The absolute number of AEs reported to VAERS in the context of the COVID-19 products is approximately 11x higher than for all of the reported AEs for 2020 combined. The absolute number of deaths reported is approximately 42x higher than for all deaths reported for 2020.[26]

56.    A study funded by the U.S. Centers for Disease Control and Prevention involved data from ten states collected from August 26, 2021, to January 22, 2022, periods during which both the delta and omicron variants were circulating. Within two months of the second COVID-19 shot, protection against emergency department and urgent care related to COVID-19 was at 69%. This dropped to 37% after five months post-shot.[27]

57.    On October 7, 2022, the Surgeon General of Florida, Dr. Loseph A. Ladapo, released an analysis on COVID-19 mRNA vaccines to the public, which stated that their studies showed a significant increased risk of cardiac-related death among men 18-39.[28]

58.    Dr. Ladapo, found that "there is an 84% increase in the relative incidence of cardiac-related death among males 18-39 years old within 28 days following mRNA vaccination."[29]

---

[25] *Id.* p. 106.
[26] *Id.* p. 114.
[27] Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (MMWR) February 18, 2022, Ferdinands JM, Rao S, Dixon BE, et al. Waning 2-Dose and 3-Dose Effectiveness of mRNA Vaccines Against COVID-19- Associated Emergency Department and URgetn Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance -VISON Network, 10 states, August 2021-January 2022. MMWR Morb Mortal Wkly Rep 2022; 7:255-263. DOI: http://dx.doi.org/10.15585/mmwr.mm7107e2; https://www.cdc.gov/mmwr/volumes/71/wr/mm7107e2.htm#suggestedcitation
[28] State Surgeon General Dr. Joseph A. Ladapo Issues New mRNA Covid-19 Vaccine Guidance; Florida Department of Health Bulletin, October 7, 2022, https://content.govdelivery.com/accounts/FLDOH/bulletins/3312697
[29] *Id.*

59.     The findings also showed that "Males over the age of 60 had a 10% increased risk of cardiac-related death within 28 days of mRNA vaccination," and that "Non-mRNA vaccines were not found to have these increased risks among any population."[30]

60.     This analysis comes after the Florida Department of Health issued guidance in March that recommended against use of the COVID mRNA vaccines for "health children and adolescents 5 years old to 17 years old."[31]

61.     On October 10, 2022, during a session of European Parliament, Dutch Parliamentary member Rob Roos, asked Pfizer executive Janine Small: "Was the Pfizer COVID vaccine tested on stopping the transmission of the virus before it entered the market?" Janine Small, president of international developed markets responded: "Did we know about stopping immunization before it entered the market? No…we had to really move at the speed of science to really understand what is taking place in the market." [32]

62.     The Food and Drug Administration wrote on December 11, 2020: "At this time, data are not available to make a determination about how long the vaccine will provide protection, nor is there evidence that the vaccine prevents transmission of SARS-CoV2 from person to person."[33]

63.     Also, in December of 2020, Pfizer CEO Albert Bourla, told NBC News, that Pfizer was "not certain" if recipients of the mRNA vaccine would be able to transmit Covid-19.

---

[30] *Id*.

[31] Florida Surgeon General: Covid mRNA vaccine found to cause 84% increase in DEATH for men ages 18-39, The Post Millennial, October 2022, https://thepostmillennial.com/florida-surgeon-general-covid-mrna-vaccine-found-to-cause-84-increase-in-death-for-men-ages-18-39

[32] Pfizer Exec Concedes COVID-19 Vaccine Was Not Tested on Preventing Transmission Before Release, The Epochtimes, Jack Phillips, October 11, 2022, updated October 13, 2022, https://www.theepochtimes.com/pfizer-exec-concedes-covid-19-vaccine-was-never-tested-on-preventing-transmission_4788577.html?utm_source=ref_share&src_src=ref_share&utm_campaign=he-cc&src_cmp=he-cc

[33] FDA News Release, FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Authorization for First COVID-19 Vaccine, December 11, 2020, https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19

Specifically, Mr. Bourla stated, "I think this is something that needs to be examined. We are not certain about that right now."[34]   (To date, Phizer, the most criminally penalized company in history, has made in excess $100 billion in revenue from the Covid-related vaccines.)

64.    And in June of 2022, Dr. Deborah Birx, the former White House medical adviser, revealed that there was evidence as early as December of 2020 that individuals who were vaccinated against Covid-19, including those who received the Pfizer vaccine, could still transmit the virus. Dr. Birx has stated, "We knew early on in January of 2021, in late December of 2020, that reinfection was occurring after natural infection"[35]

65.    Even Dr. Anthony Fauci, Chief Medical Advisor to the President and Director of the National Institute of Allergy and Infectious Diseases, admitted in July of 2021, that vaccinated people were capable of transmitting the virus.[36]

66.    Prior COVID-19 infection – *i.e*., natural immunity – offers better protection against symptomatic omicron infection more than one year later than three doses of COVID-19 shots did after one month. A graph in the New England Journal of Medicine shows that previous infection was 54.9% effective against symptomatic omicron infection after more than 12 months, while three doses of Pfizer's COVID-19 shot were only 44.7% effective a month later. The same held true for three doses of Moderna's COVID-19 shot, which were only 41.2% effective after one month, compared to 53.5% effectiveness for natural immunity more than a year later.[37]

---

[34] Pfizer Exec Concedes COVID-19 Vaccine Was Not Tested on Preventing Transmission Before Release, The Epochtimes, Jack Phillips, October 11, 2022, updated October 13, 2022, https://www.theepochtimes.com/pfizer-exec-concedes-covid-19-vaccine-was-never-tested-on-preventing-transmission_4788577.html?utm_source=ref_share&src_src=ref_share&utm_campaign=he-cc&src_cmp=he-cc
[35] *Id*.
[36] *Id*.
[37]  The New England Journal of Medicine; Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections; Heba N. Altarawneh, M.D., Hiam Chemaitelly, Ph.D., Houssein H. Ayoub, Ph.D., Patrick Tang, M.D., Ph.d., et al.; July, 7, 2022, N Engl J Med 2022, 387:21-34, https://www.nejm.org/doi/full/10.1056/NEJMoa2203965

67.     Data presented on July 17, 2021, to the Israeli Health Ministry, revealed that, of more than 7,700 COVID-19 cases reported, only 72 occurred in people who had previously had COVID-19 – a rate of less than 1%. In contrast, more than 3,000 more cases – approximately 40% - occurred in people who had received a COVID-19 vaccine. Meaning that those who were vaccinated were nearly 700% more likely to develop COVID-19 than those who had natural immunity from a prior infection.[38]

68.     The final round of correspondence the Defendant issued to the Plaintiffs gave them no choice but to get the vaccine or lose their jobs and thereby suffer deprivation of property rights.

**Plaintiff Jami Lynn Scott**

69.     Plaintiff Jami Lynn Scott was employed as a Field Reimbursement Manager for Syneos and based in Texas.

70.     Ms. Scott was considered a rehire and began her second round of employment with Syneos on March 15, 2021. She had previously been employed with Syneos, formerly known as inVentiv, from 2006-2008.

71.     Ms. Scott was on a Syneos Health contract with its client LEO Pharma.

72.     Her base pay was $120,000.00 per year with bonus pay of $30,000 per year and  a trimester payout all of which equaled a total compensation of $150,000 per year. She also received a $700 per month car allowance.

---

[38] Israel National News, Natural Infection vs Vaccination: Which Gives More Protection?; David Rosenberg, July 13, 2021. https://www.israelnationalnews.com/news/309762b

73.     A large percentage of Ms. Scott's role at Syneos was performed virtually from her home. In fact, the first several months of her employment, 100% of her work duties were performed virtually.

74.     After Syneos announced its vaccine mandate, Ms. Scott submitted her request for religious exemption through the appropriate process on October 13, 2021; she received approval for her exemption on October 21, 2021.

75.     LEO Pharma, Ms. Scott's company client only asked its employees to record their vaccination status; it did not implement testing requirements; nor did it require its employees to be vaccinated as a condition of keeping their job.

76.     After receiving an approved exemption, she was not required to submit to routine COVID testing or modify her daily work activities in any way. She was also directed by Syneos to continue visting her customers, such as LEO Pharma, in person, the same has her vaccinated peers within the company.

77.     Ms. Scott was not subjected to any additional scrutiny or requirements in order to maintain her vaccination exemption approval.

78.     Syneos later denied Ms. Scott her earned bonus, even though she met all of the required metrics, and despite the fact that she had been assured of the bonus by Syneos National Business Director, Tony DeMarco.  Mr. DeMarco promised Ms. Scott that she would "receive [her]full bonus," even if she were later terminated;

79.     Ms. Scott later tried to get Mr. DeMarco to memorialize this conversation in writing, but all attempts to communicate in writing with him either met with no written reply, or a telephone call so that there was no written record of their conversation concerning her bonus.

80.     As the January 21, 2022, termination date loomed closer, all communication between Ms. Scott and the Syneos leadership went unanswered and/or ignored. Ms. Scott sent an email to Mr. DeMarco, copying her teammate Brett Freeman, requesting a meeting to thank Mr. DeMarco for his leadership and express her gratitude for their time on the contract. But Mr. DeMarco never replied.

81.     Syneos often tried to shift the blame for its vaccine policy on to its client companies, or customer clinics or hospitals.  Ms. Scott's client company's direct manager from LEO Pharma, questioned Syneos' policy and also stressed to Syneos that LEO Pharma did not take issue with Ms. Scott being unvaccinated.

82.     At the time of her termination, Ms. Scott was thus able to continue performing her job duties without the slightest  impediment despite her unvaccinated status.

83.     On December 9, 2021, Syneos sent a letter informing all unvaccinated employees that were free to seek another role within the company that would not pose a hardship and for which they were also qualified.  Ms. Scott immediately located a Virtual Field Reimbursement role in her career section in the Dallas area. Because she was already in the Field Reimbursement role, Ms. Scott swiftly contacted Mr. DeMarco, to request a transition to that open position.

84.     Mr. DeMarco initially informed Ms. Scott that he was unsure and would get a proper answer and either return her call the same day or the next.

85.     Several days later, Mr. DeMarco finally returned Ms. Scott's phone call, but instead of discussing the Virtual Field Reimbursement position, he appeared to be on a fact finding mission regarding whether or not Ms. Scott would submit to vaccination. Ms. Scott turned his attention to the Virtual Role which was the topic of their initial discussion. Mr. DeMarco informed Ms. Scott that Syneos' vaccination policy would apply as well to a virtual role.

86.     During this turbulent time in Ms. Scott's employment with Syneos, she was eligible to receive training that would have advanced her career. This training, called Prior Authorization Certified Specialist, PACS, would have allowed her to obtain a prestigious certification, and she was eligible for this training at the company expense.

87.     However, once Syneos realized that Ms. Scott declined the COVID-19 vaccine, it withheld the training from her, but made it available to her vaccinated peers.

88.     Ms. Scott wanted to participate in the PACS training, but was denied this opportunity because of her unvaccinated status.

89.     Syneos posted Ms. Scott's position to its career site, and began recruiting and interviewing for the post while she was still gainfully employed.

90.     On January 31, 2022, Ms. Scott was terminated from her employment with Syneos.

91.     Following her termination, Ms. Scott filed for unemployment benefits with the State of Texas. Syneos attempted to have her benefits denied by responding that she was fired for "violation of company policy".

92.     The Texas Workforce Commission subsequently awarded her benefits following its investigation.

93.     Jami Scott filed a Charge of Title VII Discrimination based on religion on January 24, 2022, Charge No. 450-2022-01473.   She received a Notice of Right To Sue on July 25, 2022.

### Plaintiff Shannon Sulander

94.     Shannon Sulander began working for Syneos on July 27, 2020, as a Therapeutic Sales Specialist, assigned to the Dermira project. She is a resident of the State of Oklahoma, and was assigned to the Oklahoma City territory where she reported to District Manager, Paula McDonald.

95.    As a Therapeutic Sales Specialist, Ms. Sulander's pay rate was $2,807.70 bi-weekly, annualized to $73,000. She received performance based bonuses with annual targeted bonus of up to $22,500. She also received a $650.00 monthly car allowance.

96.    On March 10, 2021, Ms. Sulander was transferred to the position of PDN Sales Representative, assigned to the Nevro project. She reported directly to National Business Director Alan Partain.

97.    Following this transfer, Ms. Sulander received an increase to a bi-weekly pay rate of $3,076.92 annualized to $80,000 per year. She received all current provisions for benefits, including a 401K. She was also eligible to participate in a performance-based bonus plan with annual targeted bonus of up to 30%.

98.    On June 9, 2021, her sales district had a West Region Meeting in California. Ms. Sulander was told she could not attend this meeting in person unless she was vaccinated,

99.    Ms. Sulander signed up to attend virtually, and was the only employee to do so.

100.    During June of 2021, Ms. Sulander's District Manager questioned her at length about her decision not to be vaccinated. Some of these conversations lasted as long as forty- five minutes.    Ms. Sulander finally said to him that she felt like she should be having these types of medical discussions with her doctor and not with him.

101.    On July 9, 2021, Syneos held its National Sales meeting in Dallas, Texas. Ms. Sulander was again informed that she could not attend unless she was vaccinated.

102.    Despite the law in Texas was that vaccinations or masks were optional at that time in public places, Ms. Sulander was forced to attend the National Sales meeting virtually.

103.     On September 2, 2021, the day Syneos sent out its COVID vaccine mandate email to all employees, Ms. Sulander's district manager inquired whether she was going to get the vaccine.

104.     On September 21, 2021, Ms. Sulander submitted her request for a religious exemption to Syneos Health.

105.     Several days later on September 28, 2021, Ms. Sulander's district manager, Mr. Partain did a "ride along", accompanying her to Starbucks.  There, Mr. Partain conceded  that he understood her position regarding the vaccine, and that his wife felt exactly the same way. Later he said to her, "You are like the Scarlet Letter", meaning she was being ostracized for refusing the vaccine.

106.     On October 21, 2021, Ms. Sulander's religious exemption was approved.

107.     Several weeks later, on November 13, 2021, Syneos conducted a Regional Meeting held in Oklahoma City. ,  Approximately 22 people attended this meeting, and Ms. Sulander was allowed to attend in person, since she was a presenter.

108.     On December 9, 2021, Syneos sent a company-wide email stating that all unvaccinated employees would be terminated if they failed to provide proof of vaccination by January 31, 2021. Ms. Sulander received an email from her supervisor, Mr. Partain on December 16, 2021, informing her that she should not be surprised to see a posting for her job. He indicated to her that "it is being implemented to build a bench of talented candidates. If you decide to forego getting the required vaccination by the January 31, 2022 deadline. If you get the vaccine, the posting will be immediately removed."

109.    Due to personal evolving medical developments, Ms. Sulander submitted a medical exemption request due to new medical information regarding her condition on January 7, 2021. Seven days later on January 14, 2022, she received a medical exemption approval.

110.    Despite her medical exemption approval, Ms. Sulander was advised that she would be terminated on January 31, 2022, unless she were vaccinated.

111.    On January 20, 2022, Ms. Sulander contracted COVID. She submitted a doctor's note stating that because she had contracted COVID-19 she should not be vaccinated for at least 90 days.

112.    Syneos responded simply said, "per previous communications, deadline to become vaccinated was January 14, 2022."

113.    Ms. Sulander was rated first in the company for sales at the time of her termination. She continued to hold this record for several months following her termination. Mr. Partain, her former district manager, texted her following her termination: "OKC/Tulsa Territory is still leading the West in trials. You laid the ground work for that!"

114.    As a direct and proximate result of his termination, Ms. Sulander has sustained damages in the form of loss of income, back pay, front pay, emotional injury in the form of mental anguish, humiliation and embarrassment for which she is entitled to an award of compensatory damages, together with her costs and reasonable attorney's fees.

115.    Shannon Sulander filed a Charge of Title VII Discrimination based on religion on in February of 2022, Charge No. 433-2022-00961.   She received a Notice of Right To Sue on August 9, 2022.


**Plaintiff Janna Stewart**

116.     Janna Stewart worked for Syneos for nearly three years prior to her termination on January 25, 2022. She was a part time employee who held the position of Flex-Representative.

117.     Ms. Stewart was not eligible for health insurance benefits, disability insurance, life insurance nor any other resources received by full time employees.

118.      On January 21, 2021, Nicole Blum, Director HR Shared Services, stated in a letter that Ms. Stewart was an "essential worker" within the critical infrastructure as designed by the Cybersecurity and Infrastructure Security Agency (CISA).

119.     Following Syneos' announcement of a vaccine mandate, Ms. Stewart submitted a request for a religious exemption on September 14, 2021. She explained in her request that as a Christian, she believed that her "body belongs to God and it is a temple of his Holy Spirit. 1Cor 6:19-20."  Ms. Stewart also stated in her request that she would be willing to submit to a weekly rapid test.

120.     On September 22, 2021, Ms. Stewart's request for religious exemption was approved.

121.     On October 29, 2021, Ms. Stewart received another letter from Syneos again approving her exemption request. In this letter, Syneos provided an outline of the "interim accommodation process" that Ms. Stewart would need to follow, effective November 1, 2021. It also stated that "[a]s an accommodation to the Syneos Health U.S. COVID-19 Vaccination Policy and in alignment with Johnson & Johnson's customer-specific requirements, you will need to submit to COVID-19 testing on a daily basis." The letter further stated that "[a]s of November 1, 2021, employees who fail to provide proof of testing will not be allowed to interact with clients, patients, healthcare providers at sites or in the field."

122.    Syneos HR followed up on November 5, 2021 with an email stating: "to provide further clarification and guidance to the communication on October 28th for interim accommodation process for those with approved medical or religious exemptions." Syneos explained that "[a]fter continued conversations with Johnson & Johnson, we are revising our previously-issued guidance to allow at-home rapid testing for employees (replacing PCR test requirements). Additionally, we are providing clarification around testing frequency, which is based on the frequency in which you interact with clients, patients, and/or healthcare providers at sites or in the field."

123.    On November 16, 2021, Ms. Stewart tested positive for COVID-19. She reported it to Syneos Health through MyESS HR Self Service tool; and followed her doctor's instructions regarding COVID-19 protocols.

124.    On December 9, 2021, Syneos sent a letter to Ms. Stewart stating that if she was not vaccinated by January 31, 2022, she would be terminated because it would pose an "undue hardship" on Syneos Health.

125.    On the same day, December 9, 2021, Ms. Stewart attended a Plan of Action meeting (POA), in Dallas, Texas. Syneos' policy at the time stated that everyone had to be vaccinated for all in person meetings, but Ms. Stewart was required to attend the POA. For this particular meeting, everyone, (vaccinated and unvaccinated) was required to be COVID tested each morning.  Only those individuals who were not vaccinated were required to wear a face mask during the entire meeting. Vaccinated individuals could opt out of wearing a face mask, but all of the vaccinated people opted out. This created a tense environment during the POA, because it naturally exposed those who were vaccinated, and those who were not.  It effectively segregated individuals based on their vaccine status.

126.    On December 24, 2021, Ms. Stewart submitted a letter from her treating physician stating that she should not get the vaccine until at least 90 days after contracting the virus.

127.    On January 21, 2022, Syneos sent a letter demanding that Ms. Stewart to "declare your vaccination intention" by 5pm Tuesday, January 25th."

128.    In response to the letter Ms. Stewart checked the statement, "I do not intend to receive the COVID-19 vaccine after the expiration of the temporary exemption period, 2/13/2022."

129.    On January 25, 2022, Ms. Stewart received her termination letter.

130.    On the same day she received an email from Syneos requesting her to indicate her intent to vaccinate or not by 5:00 p.m. and that "Syneos health, like all employers, has the right to make its own rules for the safety of its workers." Further stating, "Syneos Health made the decision to require vaccination for covered employees prior to the promulgation of the OSHA ETS rule. As such, the recent decision from the U.S. Supreme Court does not conflict with or prevent Syneos Health's mandatory vaccination policy." The email closed with, "I suggest you speak to your doctor or your personal lawyer to answer your other questions about the COVID-19 vaccine and Syneos Health's mandatory vaccination policy."

131.    Ms. Stewart had complied with every COVID-19 policy; she switched to working from home, to working in the field, back to working from home; all the while performing her job effectively and efficiently every day.

132.    Throughout the pandemic Ms. Stewart never experienced a client office, doctor, nurse or staff member request to see a vaccination card or status.

133.    As a direct and proximate result of his termination, Ms. Stewart has sustained damages in the form of loss of income, back pay, front pay, emotional injury in the form of mental

anguish, humiliation and embarrassment for which she is entitled to an award of compensatory damages, together with her costs and reasonable attorney's fees.

134.    Janna Stewart filed a Charge of Title VII Discrimination based on religion on July 8, 2022, Charge No. 524-2022-00882.   She received a Notice of Right To Sue on August 23, 2022.

## Plaintiff Brett Freeman

135.    Brett Freeman was employed as a Sales Representative for Syneos.

136.    A day after the September 2, 2021 announcement regarding the Syneos COVID-19 Mandate, Mr. Freeman and his entire family were exposed to COVID-19, and began developing signs of infection.

137.    By September 19, 2021, Mr. Freeman was extremely ill, and suffered from extreme cough, tightness in his chest, shortness of breath and lack of sleep.

138.    On September 20, 2021, Mr. Freeman was diagnosed with severe COVID-19, double pneumonia and had a blood oxygen level of 72.

139.    The next day, he was discharged from the hospital with home health oxygen, oxygen tanks, and quarantined at his home.

140.    While at home recovering from COVID-19, on October 19, 2021, Mr. Freeman filed a request for a medical exemption with Syneos. He supported this request with  letters from three different medical providers explaining why Mr. Freeman could not submit to the vaccination mandate.

141.    Mr. Freeman also submitted a request for religious exemption explaining his beliefs.

142.    At a doctor's appointment on October 22, 2021, Mr. Freeman was ordered to remain on oxygen as he still could not consistently keep his oxygen levels above 90.

143.    On October 25, 2021, Mr. Freeman's request for medical exemption was denied.

144.    By November 2, 2021, Mr. Freeman was now considered a COVID "Long Hauler", and continued to suffer weakness, shortness of breath and various other symptoms. On that date, he responded to Syneos' denial of his request for a medical exemption and also explained his religious beliefs against the vaccine as well as additional information regarding his medical condition at that time.

145.    On November 5, 2021, Mr. Freeman's request for a medical exemption was finally approved, but only for 90 days. The approval notice mandated that he be vaccinated by December 20, 2021.

146.    On November 29, 2021, Syneos requested an interview with Mr. Freeman regarding his request for a religious exemption. This was the first time Mr. Freeman learned that his employer was requesting interviews with religious exemption claimants.

147.    The interview was conducted on December 1, 2021.

148.    One week later on December 7, 2021, Syneos approved Mr. Freeman's request for a religious exemption stating that it determined he held deep religious beliefs against taking the vaccine.

149.    Despite this admission on the part of Syneos, on December 10, 2021, Mr. Freeman received a letter stating that if he did not submit to vaccination he would be terminated on December 31, 2021. That same day, he received a new communication stating to disregard the prior communication, and informing him instead that he must comply by January 14, 2022, or January 28, 2022 would be his last day of employment.

150.    Mr. Freeman responded to HR, stating once again his deeply held religious beliefs, his medical condition and his family medical history.

151.     Syneos terminated his employment on January 28, 2022.

152.     As a direct and proximate result of his termination, Mr. Freeman has sustained damages in the form of loss of income, back pay, front pay, emotional injury in the form of mental anguish, humiliation and embarrassment for which he is entitled to an award of compensatory damages, together with his costs and reasonable attorney's fees.

153.     Brett Freeman filed a Charge of Title VII Discrimination based on religion on April. 11, 2022, Charge No. 433-2022-00732.   He received a Notice of Right To Sue on September 12, 2022.

**Plaintiff Rachel Royer**

154.     Rachel Royer was hired on June 1, 2021, as a Hematology Clinical Account Specialist in the Minneapolis Territory.

155.     Her bi-weekly pay rate was $5,769.23, annualized to $150,000.

156.     She received a performance-based bonus plan with annual targeted bonus of up to $43,000. And she received a car allowance of $650.00 per month; as well as business mileage reimbursement at a rate of $.021 per mile.

157.     On September 7, 2021, approximately five days after Syneos announced its mandatory vaccine policy, Ms. Royer emailed Tracy Snyder from Human Resources. Ms. Synder referred her to manager John Prieve, regarding Ms. Royer's questions about the vaccine mandate. In the email to Ms. Synder, Ms. Royer requested clarification regarding the Pfizer vaccine and which vaccine the September 2nd announcement was referring to. She also inquired whether Syneos would be able to provide her with safety and efficacy studies regarding the vaccine in order for her to make a well informed decision.

158.   Ms. Royer also submitted a request for religious exemption, explaining her sincerely held religious belief that she "had a sacred responsibility to honor the Lord through my body." She explained that, "[a]ll COVID-19 vaccines were derived on novel gene technologies that provide instructions to the human body to produce a spike protein that is not natural to the human body. The effects that these novel gene technologies may have on the human body and its God-given, flawless, and original genetic structure is not known. I will not desecrate my body with these substances." In closing Ms. Royer stated, "[b]ased on the known harmful side effects many individual have already experienced, it is harmful and dishonoring to my body to receive the vaccine pursuant to my sincerely held beliefs. I also believe that the use of any injection containing cell lines from an aborted fetus to be unclean and an affront to my God and my beliefs."

159.   On October 6, 2021, Ms. Royer's request for a religious exemption was approved. Syneos stated that it had "concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

160.   Ms. Royer's client contract in 2021 was with Abbvie/Pharmacyclics. According to Abbvie/Pharmacyclics' policy on December 16, 2021:

> Effective January 11, 2022, weekly proctored testing will be required for those employees who have attested that they are not fully vaccinated or have attested that they prefer not to disclose their vaccination status.

161.   Ms. Royer's client Abbvie/Pharmacyclics did not ever require its employees to be fully vaccinated, but did require that they be tested for COVID-19.

162.   When Ms. Royer was terminated on January 31, 2022, for not submitting to vaccination,  she was informed that she was not going to receive her 4th quarter 2021 bonus that she had earned as of December 31, 2021.

163.     Syneos claimed that even though she worked through the plan period, the eligibility policy states that she must be a company employee at the time of the payout. The payout conveniently for Syneos was after the January 31, 2022, Ms. Royer's date of termination.

164.     As a direct and proximate result of his termination, Ms. Royer has sustained damages in the form of loss of income, back pay, front pay, emotional injury in the form of mental anguish, humiliation and embarrassment for which she is entitled to an award of compensatory damages, together with her costs and reasonable attorney's fees.

165.      Rachel Royer filed a Charge of Title VII Discrimination based on religion on February 9, 2022, Charge No. 433-2022-01009.   She received a Notice of Right To Sue on August 12, 2022.

**Plaintiff Joey Lewis**

166.     Joey Lewis was employed by Syneos for over seven years.

167.     Even before the pandemic Mr. Lewis worked approximately 50-80% virtually from home.

168.     After Syneos announced its vaccine mandate, Mr. Lewis submitted a request for a religious exemption on September 20, 2021. This request was granted ten days later on September 30, 2021.

169.     On October 29, 2021, Syneos sent an email to Mr. Lewis stating that the accommodation process required that he submit to daily PCR testing at a facility for COVID-19, even if Mr. Lewis was not conducting in-person calls to clinics and simply working from home. All test results were to be uploaded into an online portal every day.

170.     Several days later on November 5, 2021, Syneos revised this protocol and allowed at home rapid testing to replace the PCR testing requirement.

171. On December 9, 2021, Mr. Lewis received the news that he must receive his first dose of the COVID-19 vaccine by January 14, 2022 and the second by January 31, 2022, or else he would be terminated.

172. On December 23, 2021, Mr. Lewis discovered that his job was posted on both LinkedIn and the Syneos Health Career site.

173. After termination, Mr. Lewis was left with no form of transportation because Syneos took his company vehicle. When he asked whether he would be able to purchase the car from Syneos, he was told he would not be able to purchase it. On previous contracts with Syneos, Mr. Lewis had been allowed to purchase his company vehicle.

174. Mr. Lewis was also denied his fourth quarter $10,000 bonus for September – December 2021.

175. Throughout 2021, Mr. Lewis was ostracized and treated as an outcast by management and various other employees because he refused to get vaccinated. The harassment included being told it that it was his "duty" and "for the good of society" to be vaccinated.

176. As sole provider for his family, termination has caused an undue hardship, stress both physically and emotionally for the entire Lewis family.

177. As a direct and proximate result of his termination, Mr. Lewis sustained damages in the form of loss of income, back pay, front pay, emotional injury in the form of mental anguish, humiliation and embarrassment for which he is entitled to an award of compensatory damages, together with his costs and reasonable attorney's fees.

178. Joey Lewis filed a Charge of Title VII Discrimination based on religion on May 5, 2022, Charge No. 433-2022-00856. He received a Notice of Right To Sue on August 5, 2022.

**Plaintiff Korri Culbertson**

179.   Korri Culbertson was employed with Syneos for over eight years.

180.   Even before the pandemic Ms. Culbertson worked approximately 50-80% virtually from home.

181.   Ms. Culbertson submitted her request for a religious exemption to Syneos on September 20, 2021. It was granted ten days later on September 30, 2021.

182.   Obtaining the religious exemption was not a simple task. Syneos delved into her personal religious views and demanded for specifics regarding the name of her church pastor, the name of her denomination, and other details regarding her religious faith.

183.   On October 29, 2021, Syneos sent an email to Ms. Culbertson stating that the accommodation process required daily PCR testing at a facility for COVID-19 even if she was not conducting in-person calls to clinics and simply working from home. All test results were to be input into an online portal every day.

184.   Several days later on November 5, 2021, Syneos revised this protocol and allowed at home rapid testing to replace the PCR testing requirement.

185.   December 9, 2021, Ms. Culbertson received notice from Syneos that she must have her first dose of vaccine by January 14, 2022 and her second vaccine by January 31, 2022, or be terminated.

186.   On December 23, 2021, Ms. Culbertson discovered that her job was posted on both LinkedIn and the Syneos Health Career site.

187.   Ms. Culbertson was also left with no form of transportation after Syneos took her company vehicle.   When she inquired whether he would be able to purchase the car from Syneos, as per Company policy, she was told she would not be able to purchase it. This was contrary to the

company's previous practice; Syneos had allowed Ms. Culbertson to purchase her company vehicle after previous contracts.

188.    Throughout 2021, Ms. Culbertson, like Mr. Lewis, was treated as an outcast by management and various other employees because she refused to get vaccinated. The harassment included being told it was her "duty" and "for the good of society" to be vaccinated.

189.    When Ms. Culbertson learned that there was a possibility of working in another position with Syneos that would not require vaccination, she attempted to fill this position.

190.    When Ms. Culbertson was in the hiring phase with another company, after being terminated, while in the midst of this hiring process she found out that Syneos had placed flagged her employment record by indicating that an investigation had found something that the prospective employer may want to consider before proceeding with the hiring process. This label, "consider", essentially notified the new company not to hire Ms. Culbertson, without doing a further investigation.

191.    Ms. Culbertson was also never received her earned referral bonus of $6,000, for referring another employee, Sandy Collard, who was hired based upon Ms. Culbertson's recommendation.

192.    Likewise, Ms. Culbertson never received her $10,000, fourth quarter bonus, which was achieved from September through December of 2021; nor did she receive her $5,000 retention bonus for 2020.

193.    As a direct and proximate result of his termination, Ms. Culbertson sustained damages in the form of loss of income, back pay, front pay, emotional injury in the form of mental anguish, humiliation and embarrassment for which she is entitled to an award of compensatory damages, together with her costs and reasonable attorney's fees.

194.    Korri Culbertson filed a Charge of Title VII Discrimination based on religion on January 10, 2022, Charge No. 433-2022-00782.   She received a Notice of Right To Sue on August 2, 2022.

### Plaintiff Bruce McConnell

195.    Bruce McConnel began his employment with Syneos on February 12, 2020 as a Professional Sales Representative, working on the contract with Johnson & Johnson.

196.    On September 16, 2021, Mr. McConnell submitted to Syneos his request for a religious exemption.

197.    On October 29, 2021, after a meeting with Human Resources regarding whether or not Mr. McConnell held a sincere religious belief, he was finally granted his religious exemption. However, the accommodation required masking and daily COVID-19 testing.

198.    Mr. McConnell received a letter in December of 2021 informing him that his accommodation was being revoked and that if he had until December 14, 2021 to upload a copy of his vaccination card or  he would be terminated on January 31, 2022.

199.    Bruce McConnell was terminated from his employment on January 31, 2022.

200.    As a direct and proximate result of his termination, Mr. McConnell sustained damages in the form of loss of income, back pay, front pay, emotional injury in the form of mental anguish, humiliation and embarrassment for which he is entitled to an award of compensatory damages, together with his costs and reasonable attorney's fees.

201.    Bruce McConnell filed a Charge of Discrimination on October 13, 2022 in the Denver Field Office of the EEOC, Charge No. 433-2022-02147.  On October 13, 2022, he also filed with the EEOC a request for Notice of Right To Sue Letter.

## COUNT I
### 42 U.S.C. §2000e
### Employment Discrimination Based on Religion

202.     Plaintiffs incorporate by reference herein the allegations contained in ¶ 1-185, and does further allege as follows.

203.     Title VII of the Civil Rights Act of 1964 makes it unlawful for employers subject to the Act to discriminate on the basis of a person's "race, color, religion, sex, or national origin…" 42 U.S.C. §2000e-e2(a). Title VII, 42 U.S.C §2000e, *et. seq.*, is a comprehensive antidiscrimination statute that was enacted to safeguard all individuals from discrimination because of race, creed, color, religion, sex, age or national origin in connection with their employment. "Undue hardship" in the context of religious exemptions is a term associated with Title VII of the Civil Rights Act. "An employer may assert undue hardship to justify a refusal to accommodate an employee's need . . . if the employer can DEMONSTRATE that the accommodation would require "more than a de minimis cost." 29 C.F.R. sect 1605.2 (e)(1). The employer has te burden of persuasion to demonstrate "undue hardship." See e.g. *EEOC v. Firestone*, 515 F 3d 307, 315 (4th Cir. 2008). It should be noted in this case that the only explanation Syneos purported to provide the claimants herein to justify its determination of undue burden was to vaguely and falsely reference "the needs of the business and client demands as they currently exist," and "the requirements of field facing employees current role." There was no suggestion that the requirements of a employee's current role for the client company of Syneos imposed any burdens whatsoever on Syneos. Indeed, Syneos imposed a blanket, non-case-basis, non-supported, unconstitutional assertion of undue hardship. As noted, the facts of the case will unequivocally establish that several of these claimants were even virtually from home.

38

204.     Under Title VII, discrimination based on an individual's right to not inject a substance into their bodies due to an individual's religious beliefs is no less prohibited under Title VII than discrimination based on one's right to pray or worship.

205.     Syneos is an "employer" as that term is defined in 42 U.S.C §2000e(b).

206.     The actions of Syneos, in forcing the Plaintiffs to be terminated from their positions, were motivated in whole, or in part, out of discriminatory animus based on the Plaintiffs' religious beliefs and desire to not inject themselves with a foreign and deleterious substance.

207.     Defendant's actions were willful, wanton and/or malicious.  As a consequence of Syneos' discriminatory practices, the Plaintiffs have suffered economic and pecuniary damages for which they are entitled to judgment.

208.     In addition, as a direct consequence of Syneos' actions, the Plaintiffs have suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

**COUNT II**
**Retaliation**

209.     Plaintiffs incorporate by reference herein the allegations contained in ¶ 1-192, and do further allege as follows.

210.     Title VII's anti-retaliation provision in the following terms:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e-3(a)

211.     The anti-retaliation provision, unlike the substantive provision of Title VII prohibiting workplace discrimination, is not limited to discriminatory actions that affect the terms

and conditions of employment. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2412-13, 548 U.S. 53,64 (U.S. 2006).

212.    The actions of Syneos in imposing unreasonable work restrictions on the Plaintiffs by terminating them and by denying several claimants quarterly bonuses (as above pleaded) due to their refusals to submit to a religiously-objectionable vaccine was retaliatory in nature and in violation of § 2000e-3(a).

213.    Defendant's actions were deliberate, willful, wanton and/or malicious.   As a consequence of Defendant's retaliation against the Plaintiffs, they have suffered economic and pecuniary damages for which they are entitled judgment.

214.    In addition, as a direct consequence of the Defendant's retaliatory conduct, the Plaintiffs have each suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment and mental anguish for which they are entitled to recover compensatory and/or punitive damages in an amount to be determined by the jury.


## COUNT III:  FRAUD


214.    All previous paragraphs of this Complaint are hereby incorporated by reference in this cause of action.

215.    As specifically pleaded above, Syneos, in a succession of Syneos communications to employees, beginning in March, 2021 and ending in September of 2021, contained representations that accommodations would be made for sincere religious exemption. Given the sudden and unexplained reversal of policy on this point, these representations proved to be not just illusory, but deliberately misleading.  Indeed, to date, no

justification for the reversal of policy has been made, despite numerous employee requests and despite the provision by several employees of proof that Syneos client companies were in no way inconvenienced by the employee's lack of vaccination (See Rachel Royer biographical material, above). Indeed, with regard to the client companies Janssen Pharmaceuticals, Neuro Pharma, Leo Pharma, and Pharmacyclics served by Syneos employees Lewis, Culbertson, Stewart, Sulander, Scott, Freeman and Royer, the client companies were not even requiring testing, unless the employees wished to have testing, in which case the client company would pay the cost of the testing at no expense to contracting employer Syneos. Syneos, on the contrary provided claimant Jamie Scott a written statement during her EEOC determination that the cost to Syneos of testing this small number of exemption claiming employees would result in an undue financial burden reaching into the hundreds of thousands of dollars. The act is, that the testing for many of these claimants' testing would have approached zero. This fact and others were made known to Syneos. Yet, Syneos claimed notwithstanding an "undue hardship," with full intent that the employee rely on this representation.

216.    In point of fact and as pleaded specifically herein, a temporary accommodation was made for over two months for these claimants, with no known complaints from the paying source client companies regarding the employees' vaccination status. Indeed, with regard to plaintiffs Jamie Scott and Brett Freeman, there is written record of client companies defending the employees in the face of the Syneos-threatened firings. The client company (the company providing Syneos with its compensation / income) in each client case of each plaintiff herein, expressed no dissatisfaction with the respective

employee. Syneos stood only to gain, not to lose, by firing these claimants. There was in fact no need for significant further expenditure on the part of Syneos for the sought accommodations, and this further indicates the disingenuous and deceptive nature of Syneos' about-face.

217. As a final proof of the intentionally deceptive communications of Syneos involving the promises to accommodate that were withdrawn and the reasons of lack of accommodation for the withdrawal of the promises, it must be noted that each and every one of these plaintiffs conducted at least some of their employment activity from the home, virtually. As noted herein, some had a greater than 50% virtual workload. Syneos deliberately provided no accommodation, no attempt to place the employee claimants in other positions or in increased virtual environments or to fulfill any of the other promises toward accommodation it made in its early communications regarding the vaccination issue.

218. Thus, in addition to the deliberately false representations that accommodations would be made, Syneos provided deliberately false and unsupported statements to justify its basis for having made the misrepresentations.

219. Syneos made the representations regarding accommodation and the subsequent false representations regarding its inability to accommodate with full knowledge of the falsity of said statements and with the full expectation and intention that the plaintiffs herein would rely on said false statements. Syneos intended to induce reliance and plaintiffs did reasonably rely on the false statements to the damage of themselves. Said

damage took the form of being dissuaded from seeking timely legal advice to protect their jobs prior to the vaccinate or terminate letters of September, 2021 and December, 2021, and of failing due to their reasonable reliance on the false representations to seek other employment so as to avoid losing income. Each and every of the plaintiffs can and will demonstrate pecuniary loss as a direct and proximate cause of the said false and intentionally deceptive representations of Syneos as cited herein. Syneos intended to induce reliance or should reasonably have known such reliance by plaintiffs would result, and as such, behaved in a willful, wanton and / or malicious manner. As such, plaintiffs are entitled to actual and punitive damages.

## COUNT IV: UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER CHAPTER 75 OF THE NORTH CAROLINA CODE

220.    All previous paragraphs of this Complaint are hereby incorporated by reference in this cause of action.

221.    Cumulatively and/or in the alternative, the false representations and/or concealments of the material facts as specifically plead in Counts I through III above were in or affecting commerce. The misrepresentations, omissions and coercive uses of the employer role in order to deprive certain employees of customary benefits and employment constitute unfair and deceptive acts or practices and/or unfair methodologies of competition on the part of Defendant Syneos.

222.    These unfair and deceptive trade practices have redounded to proximately cause damage to the claimant Plaintiffs, hereto, and Plaintiffs are entitled to judgment therefore.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)     That Plaintiffs be allowed to file this Complaint and that process issue to Syneos requiring it respond within the time required under the Federal Rules of Civil Procedure;

(b)     A declaratory judgment that the Defendant's actions, statements and retaliatory conduct violated the Plaintiffs' statutory rights under Title VII, 42 U.S.C. § 2000e;

(c)     That Plaintiffs have and recover nominal damages;

(d)     That Plaintiffs be awarded compensatory damages, including back pay, front pay and compensatory damages, in an amount to be determined at trial,  together with their costs and reasonable attorney's fees against the Defendant Syneos;

(e)     That Plaintiffs be awarded punitive damages in an amount to be determined by the jury on all claims so eligible hereunder;

(f)     That the Plaintiffs recover actual and compensatory damages under Chapter 75 of the North Carolina General Statutes, and that said amount be trebled in accordance with law.  That said remedy be granted as an alternative and/or cumulative remedy to Plaintiffs with relation to other available remedies.

(f)     That a jury be empaneled to hear and try this action;

(g)     Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Respectfully Submitted,

*/s/ Larry L. Crain*

**Larry L. Crain** TN Bar No. 9040
**CRAIN LAW GROUP, PLLC**
5214 Maryland Way, Suite 402
Brentwood, TN  37027
Telephone:  (615) 376-2600
Fax:  (615) 345-6009
Email: larry@crainlaw.legal
*(Request for Admission Pro Hac Vice Pending)*

*/s/ Emily Castro*

**Emily Castro** TN Bar No. 028203
5214 Maryland Way, Suite 402
Brentwood, TN  37027
Telephone:  (615) 376-2600
Fax:  (615) 345-6009
Email: emily@crainlaw.legal
*(Request for Admission Pro Hac Vice Pending)*

*/s/ Krispen Culbertson*

**Krispen Culbertson,** NC Bar No. _____
Culbertson & Associates
315 Spring Garden Street
Greensboro, NC 27401
Telephone:  (336) 272-4299
Email:  syneos.law@protonmail.com

*Attorneys for the Plaintiffs*